UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MANNY LOPEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:11-CV-891 (CEJ) |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Plaintiff Manny Lopez was a passenger in a vehicle involved in a collision with a United States Postal Service truck driven by Robert Cleveland. He brings suit for damages under the Federal Torts Claim Act, 28 U.S.C. §§ 2671 *et seq.* (FTCA).[1] Plaintiff seeks $20,623.25 for medical care he has already received, an additional $100,000.00 for future surgery to his cervical and lumbar spine, and $130,000.00 for past and future pain and disability.

The parties appeared for a bench trial on May 6, 2013 After considering the evidence presented and the parties' stipulation of facts, the Court makes findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P.

I. **Background**

---

[1]Plaintiff also filed a negligence claim against Shea Pyron, the driver of the vehicle in which he was a passenger, and Pyron filed a separate FTCA action against the United States, Pyron v. United States of America, No. 11-CV1387 (CEJ). The two cases were consolidated. Pyron settled her claim against the government and moved for summary judgment on plaintiff's negligence claim. Plaintiff contended that there was a genuine dispute of material fact based on Mr. Cleveland's statement to the investigating officer that Pyron "suddenly jumped" in front of him. Mr. Cleveland died before his deposition was taken and the police report in which this statement appeared was inadmissible hearsay. Pyron's summary judgment motion was granted.

On August 13, 2009, at approximately 9:46 p.m., a USPS tractor trailer operated by Robert Cleveland collided with the rear end of a Volkswagen Beetle driven by Shea Pyron. Plaintiff was in the passenger seat of the Pyron's car. Pyron and plaintiff were wearing their seatbelts. The collision occurred near the intersection of Tucker Boulevard and Washington Avenue in the City of St. Louis.

At the time of the collision, Tucker Boulevard was undergoing construction immediately north of the intersection with Washington Avenue. Approaching the intersection, northbound Tucker had four lanes: The centermost lane was a left-turn-only lane. To the right of the turn lane was a through lane that allowed vehicles to continue north on Tucker across Washington. To the right of the through lane was a lane with markings in the roadway indicating that vehicle traffic was not permitted (the "run-out lane"); the markings begin approximately one-half block south of the intersection and construction barriers blocked the lane just north of the intersection. The curb-side lane was a right-turn-only lane. Trial Tr. at 97-101. The collision occurred after Pyron drove from the run-out lane into the through lane and stopped for a traffic signal that was changing from green to yellow.

On the night of the collision, Pyron and plaintiff were traveling to a restaurant where Pyron had never been. Shea Pyron Dep., Def. Ex. R at 22. Plaintiff was giving Pyron directions and the two were also talking and listening to the radio. Pl. Dep., Def. Ex. Q at 28; Pyron Dep. at 21-22. Pyron, who had not driven on Tucker Boulevard often, testified that she moved leftward into the through lane about two blocks before Washington Avenue. Id. at 22, 24. As she approached the intersection at Washington, the traffic signal turned yellow and she stopped. Id. at 31. She did not look in the rearview mirror before applying her brakes. Id. at 32. The light turned red as she came to a complete stop and, immediately thereafter, her vehicle was struck from

behind by the USPS truck.  Id.  The air bags did not deploy.  Id. at 44.  Pyron and plaintiff testified that the impact pushed Pyron's car through the stoplight and into the intersection.  Pyron Dep. at 25; Trial Tr. at 11, 43.  They also testified that Pyron pulled her car over to the right, away from the collision site.  Pyron Dep. at 32: Trial Tr. at 11.

Police officer Janet McKern responded to the scene of the accident.  She has been a police officer with the St. Louis Metropolitan Police Department for 23 years.  Trial Tr. at 84.  Since graduating from the police academy in 1990, Officer McKern has been assigned to the Seventh District as a patrol officer, to the Domestic Abuse Unit, the Sex Crimes Unit, the Detective Bureau, and the Warrant Fugitive Section.  In each of these positions, Officer McKern was required to interview witnesses, gather information, and write police reports.  In August 2009, it was a routine part of her job to respond to car accidents and write up reports.  Id. at 87.  Officer McKern testified that when she arrives at the scene of an accident, it is her practice to first talk to all involved parties to see if anyone requires medical attention.  She then talks with the drivers to hear their version of the event.  She makes note of the intersection, the weather conditions, the location of the vehicles, and any construction, barriers, or detours.  She then completes the Missouri Uniform Accident Report.  She estimated that she had completed hundreds of such reports in the course of her employment.  She testified that, based on drivers' statements, she can frequently tell who is at fault.  Id. at 90.

Officer McKern testified that she had no independent recollection of the accident and her testimony was based on the report she completed at the time of the accident.[2]

---

[2]Defendant designated Officer McKern as a non-retained expert on November 19, 2012.  Def. Ex. V.  Plaintiff did not object to her qualifications to offer expert testimony until trial.  The Court ruled that the objection was untimely and permitted

Trial Tr. at 91-92; Def. Ex. G. When she arrived at 9:55 p.m., Officer McKern observed that both vehicles were in the through lane, a few feet before the intersection. Trial Tr. at 96. When Officer McKern asked the drivers and plaintiff if they required medical attention, they all declined. Trial Tr. 92-93. Officer McKern testified that, after interviewing the drivers, she concluded that the accident occurred when Pyron suddenly shifted lanes from the run-out lane and "jumped" in front of the Postal Services truck in the through lane. Trial Tr. at 102. Officer McKern also testified that accidents of this type occurred frequently at this location. Id. at 112-13.

Plaintiff's testimony regarding the accident was not credible in several respects. First, he testified that the collision occurred around 6:30 or 7:00 p.m., while there was still daylight. Trial Tr. at 34-35. When told that the police report indicated that the accident occurred at 9:45 p.m., he insisted that "it was still light out. And I don't recall it being light at 9:45 ever." Id. at 35.

Plaintiff also testified that the collision occurred several blocks south of Washington Avenue (Trial Tr. at 35, 103; Pl. Dep. at 57), and that Pyron moved into the through lane far earlier than she claimed. See Pl. Dep. at 21-22 ("[W]hen we came down over the bridge she had been in that lane."). Photographic evidence at trial show the lane-ending markings in the run-out lane beginning around one-half block south of the intersection. Pyron told the police that she changed lanes when she saw that her lane was about to run out. So, at that point she had to be closer than two blocks from the intersection.

Plaintiff's trial testimony about the severity of the collision is inconsistent with the objective evidence. Plaintiff testified that Pyron's car was "destroyed," and the rear of the vehicle was "smashed in." Trial Tr. at 43; Pl. Dep. at 29, 70. However,

---

Officer McKern to testify about her opinions and conclusion. Trial Tr. at 105-06.

photographs taken at the scene show only light damage to the rear of Pyron's car -- the lens of one tail light is missing, the license plate holder is askew, and there are black scuff marks on the bumper and lower portion of the trunk. Pyron was able to drive the car home that evening and to Carbondale, Illinois a few days later. Pyron Dep. at 50. There is no evidence that the car sustained any structural damage and the body work was completed for $2,147.48. Def. Ex. S. This was minor damage, considering the relative size of the vehicles.

Plaintiff testified at trial that he felt pain in his neck and back immediately after the collision and that his ankle was sprained. Trial Tr. at 10, 12. He first sought medical care five days after the accident, and at that time he reported that he felt fine immediately after the accident and did not experience pain until two or three days later. Plaintiff was diagnosed with muscle strain and a sprained ankle, which was wrapped in an ace bandage. Def. Ex. M; Trial Tr. at 14-15. Plaintiff testified at deposition that his ankle no longer bothered him after a week or two. Pl. Dep. at 40. At trial, however, he testified that he had pain in his ankle for three or four weeks or longer. Trial Tr. at 45.

On October 6, 2009, plaintiff consulted George Schoedinger, M.D., with complaints of pain in his neck and low back. Def. Ex. N. Plaintiff told Dr. Schoedinger that he experienced pain on the right side of his head, neck, low back, and right ankle immediately after the collision. He assumed the pain would subside so he did not seek medical care right away. Id. Dr. Schoedinger prescribed pain medication and home exercises. Id. at 51.

X-rays and MRIs of the cervical and lumbar spine were normal. Schoedinger Dep., Pl. Ex. 9 at 48, 51-52. Cervical and lumbar myelograms completed in November 2009 disclosed minimal disc disease process at C5-C6, L4-L5 and L5-S1. Def. Ex. M-1

through M-4. Plaintiff also underwent discography, a procedure in which dye is injected into the disc to see if the patient's pain can be reproduced. Schoedinger Dep. at 18-19. Dr. Schoedinger reported that these tests caused reproduction of plaintiff's pain at the L5-S1 level and at the C5-C6 level. Def. Ex. N.

Plaintiff had a history of back pain. In 2001, he was in a car accident and sought treatment for pain in his neck and back. Trial Tr. at 17; Interrogatory Resp., Def. Ex. C at ¶14. In 2005, he sustained a pinched nerve when he lifted a television at work. Id. On April 8, 2008, plaintiff's primary care physician noted that plaintiff had suffered from low back pain for years. Def. Ex. D. In 2012, plaintiff slipped and fell forward, jamming his shoulder. Trial Tr. at 83-84. Plaintiff did not tell Dr. Schoedinger about his prior back issues, despite being asked, which detracts from his credibility. Trial Tr. at 47-52; Schoedinger Dep. at 46; Ex. N. However, the existence of these prior injuries did not fundamentally change Dr. Schoedinger's opinion that plaintiff's complaints of pain were attributable to ruptured discs at C5-C6 and L5-S1, which were either caused by or made symptomatic by the collision. Schoedinger Dep. at 41. Dr. Schoedinger acknowledged that it was not possible to tell whether the collision caused plaintiff to sustain ruptured discs. Schoedinger Dep. at 64.

Dr. Schoedinger advised plaintiff that "until such time as he is unable to live with his difficulty, . . . only nonoperative measures" were recommended. Pl. Ex. 4. Dr. Schoedinger opined that, in the event plaintiff opted for surgery, cervical fusion would cost $45,225 and lumbar discectomy would cost $60,075. Pl. Ex. 4. David S. Raskas, M.D., performed an independent medical examination of plaintiff for the defendant. Raskas Dep. at 6. Dr. Raskas diagnosed plaintiff with cervical strain, chronic neck pain, lumbar strain, and chronic low back pain. Def. Ex. L. Dr. Raskas opined that

plaintiff's pain was not the result of the accident. He recommended physical therapy and recommended against surgical intervention.

Plaintiff was unemployed at the time of the accident. In March 2010, he began working for a construction company selling siding, roofing, and windows in areas affected by severe weather. Trial Tr. at 8, 68-70. His job sometimes requires him to travel to locations outside St. Louis, such as Oklahoma, and Kansas City. Since the accident, plaintiff has been able to drive himself around St. Louis and to other locations to perform his job. Id. at 8, 71-72. Plaintiff's work involves going into neighborhoods, walking door to door to solicit business. Id. at 69. Plaintiff does 60-70% of his work in an office and in his truck, which is outfitted with a laptop and a desk. Id. at 71. During storm season, which he defined as between February and October, plaintiff typically works 80 hours a week. Id. at 70.

Plaintiff testified that he has pain in his arms and legs and "general discomfort all the time." Trial Tr. at 24. The pain prevents him from sleeping more than an hour or two and he usually sleeps sitting up in a chair or couch. Id. He used to bicycle frequently but has not tried to do so since the accident. He cannot fish for as long as he used to. Id. at 25. Initially, he took Flexeril and Vicodin for pain but quit because they were not working and he was worried about becoming addicted to narcotics. Trial Tr. at 59, 60, 66. He then began taking over-the-counter medications, such as Advil and Aleve, but they also did not alleviate his pain. Id. at 62, 75. At the time of his deposition in August 2012, plaintiff had not taken any prescription or over-the-counter pain medicine for more than a year. Trial Tr. at 84.

Plaintiff testified that Dr. Schoedinger said that if the pain was more than he could "deal with," he would have to have surgery to place titanium posts in his neck. Trial Tr. at 23-24. He testified that he had not undergone surgery because he was

"not thrilled" about having titanium posts inserted in his spine, and he hoped that the pain would subside with exercise and stretching.  Id.  He later testified, though, that he would have had the surgery if he did not have to pay for it.  Id. at 76-77.  Plaintiff last sought medical treatment for his back and neck in March 2010.  Trial Tr. at 62.

Although plaintiff complains of constant back and neck pain that prevent him from sleeping, he is able to work long hours, solicit door-to door sales on foot, and drive long distances.  Plaintiff delayed seeking medical treatment following the accident, and discontinued treatment seven months after the accident.  Plaintiff rejected narcotic medication and later discontinued all pain medication.  The Court finds that plaintiff's testimony regarding the extent and seriousness of his injuries is not credible.

### III.   Discussion

The FTCA waives the sovereign immunity of the United States and renders it liable in tort "in the same manner and to the same extent as a private individual under like circumstances, but [it] shall not be liable for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.  The law of Missouri, as "the law of the place where the act or omission occurred," provides the substantive law applicable to plaintiff's negligence claim.  28 U.S.C. § 1346(b)(1).

Under Missouri law, to prove a claim of negligence a plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused injury to the plaintiff.  Lesch v. United States, 612 F.3d 975, 981 (8th Cir. 2010) (citing Lopez v. Three Rivers Elec. Co-op., Inc., 26 S.W.3d 151, 155 (Mo. 2000)).  In Missouri, a driver has a duty to operate his vehicle at a safe rate of speed under the conditions, keep a careful lookout, yield the right of way, remain on the proper side of the road, not make

turns unless making sure they are safe, and take evasive action when possible to avoid a collision. Id.

Plaintiff asserts that he is entitled to judgment in his favor under Missouri's "rear-end collision doctrine," which provides that:

> if one has his vehicle in a portion of the highway where he should have it in view of his course, and another traveling behind him in the same direction overtakes him and permits his vehicle to run into the rear of the one ahead, proof of the collision . . . makes out a *prima facie* case of specific negligence against the driver operating the overtaking vehicle.

Clark v. Belfonte Distrib., Inc., 163 S.W.3d 581, 583 (Mo. Ct. App. 2005). The rationale is that the "party in the vehicle behind has a view of what is in front and can better explain why his vehicle struck the rear of the car ahead." Mueller v. Storbakken, 583 S.W.2d 179, 182 (Mo. 1979) (*en banc*). "Time and distance available to the overtaking driver are necessary factors" in determining whether the driver "permitted" the collision to occur. Kaufmann by Kaufmann v. Nagle, 807 S.W.2d 91, 95 (Mo. 1991) (*en banc*). When applicable, the rear-end collision doctrine only establishes a *prima facie* case; it does not compel a directed verdict. Clark, 163 S.W.3d at 584. After a plaintiff establishes that he was in a place where he had a right to be, the burden shifts to the defendant to produce evidence rebutting the *prima facie* case. Id. In order to avoid liability, the defendant is obligated to present evidence of defense or excuse. Id.

The Court concludes that the accident occurred because Pyron shifted into the through lane on Tucker shortly before the Washington intersection just as the traffic signal changed from green to yellow. The driver of the USPS vehicle did not have sufficient time and room to avoid the collision when Pyron applied her brakes, and thus the rear-end doctrine does not apply. The Court discounts Pyron's testimony that she pulled into the through lane far enough in advance of the intersection to allow the

truck to safely stop — - - Pyron was traveling to an unfamiliar location and was on a street she did not know very well and that was disrupted by construction. The radio was playing and she and plaintiff were talking. This evidence suggests that Pyron was driving under distracting circumstances when she simultaneously encountered the end of the run-out lane and a changing traffic light.

The Court has not credited plaintiff's testimony regarding when Pyron shifted to the through lane because inconsistencies suggest that he was not paying close attention before the impact and that his recollection is flawed. The Court finds credible Officer McKern's testimony that many drivers in the run-out lane are caught short when they reach the intersection and swerve into the through lane. Plaintiff argues that Officer McKern's testimony should be excluded because she is not qualified an accident reconstructionist. However, plaintiff waived objections to Officer McKern's qualifications by failing to object before trial. Furthermore, Officer McKern's testimony regarding the intersection and the frequency with accidents occur there does not require the special skills of a reconstructionist.

Based on the foregoing, the Court finds that plaintiff has not established that the driver of the USPS truck was negligent. Judgment will be entered in favor of defendant and against plaintiff on his claim under the FTCA.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 16th day of December, 2013.